UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLAYTON KEARNEY,

        Plaintiff,

v.                                             CASE No. 8:06-CV-595-T-24TGW

AUTO-OWNERS INSURANCE
COMPANY,

        Defendant.

_____/


REPORT AND RECOMMENDATION

        The plaintiff in this case has sued the defendant insurer seeking

uninsured motorist benefits under primary and umbrella policies issued by

the defendant.   Both parties have filed motions for partial summary

judgment regarding the level at which the umbrella policy's uninsured

motorist coverage takes effect.  The plaintiff also argues in its motion that

the defendant may not maintain an affirmative defense that he failed to use

an operational seat belt because he was a minor who was a passenger in the

uninsured vehicle.  Based upon the parties' submissions, I recommend that

the court find the defendant's umbrella policy takes effect when the

plaintiff's personal injury damages reach $530,000.   In addition, I

recommend that the defendant be permitted to assert an affirmative defense under common law that the plaintiff failed to use an operational seat belt.

## I.

On July 27, 2002, the plaintiff, Clayton Kearney, was a passenger in an uninsured motor vehicle that was involved in an accident in which he suffered bodily injuries (Doc. 2, p. 2, ¶¶ 6, 9, 10; Doc. 48, pp. 1-2).[1] The defendant, Auto-Owners Insurance Company, issued two policies to the plaintiff's father, Charles W. Kearney, Jr., that provided uninsured motorist ("UM") benefits (Doc. 2, p. 2, ¶12, p. 4, ¶20; Docs. 2-2, 2-3). The primary policy is entitled "Recreational Vehicle Policy" and a second policy is entitled "Executive Umbrella policy" (Docs. 2-2, 2-3). The parties do not dispute that the defendant's policies provide coverage to the plaintiff (see Docs. 48, 81).

The defendant's umbrella policy was to provide UM benefits of five million dollars for each occurrence in excess of the retained limit specified in the policy (Doc. 2-2, p. 10; Doc. 48, p. 2; Doc. 63-2, p. 2). The parties' dispute centers around the point at which the umbrella policy begins to provide coverage for the plaintiff's alleged damages.

---

[1] The driver, Jason Manning Knight, and the other owner of the vehicle, Anthony David Sorrentino, did not insure the vehicle (Doc. 2, p. 3, ¶14).

The umbrella policy defines the retained limit as (Doc. 2-3, p. 6; Doc. 63-2, p. 14):

> ...the greater of:
> (a) the sum of the limits of liability:
>     (1)  stated for each policy listed or insurance described in Schedule A; and
>     (2)  applying to any other underlying insurance; or
> (b) $250 with respect to any one occurrence not covered by other insurance.

The parties do not dispute that section (b) does not apply in this case (Doc. 48, pp. 3, 10; see Doc. 63).  Therefore, only section (a) is at issue.

The determination of the retained limit under section (a) is complicated by the presence of a second policy issued by Zurich American Insurance Company.  Zurich issued a primary policy to the plaintiff's father's company, Kearney Development Company, Incorporated ("KDC") (Docs. 48-3, 48-4), which purchased coverage for 145 vehicles (Doc. 48-3, p. 30).  The plaintiff was a named insured under the Zurich policy (id. at p. 22; Doc. 63-5, p. 1).  Therefore, at the time of the plaintiff's accident, the two primary policies in effect were Zurich's policy and the defendant's policy.

In a related matter, the plaintiff previously filed suit in Hillsborough County Circuit Court against Zurich for UM benefits under the Zurich policy and for unfair claims handling practices and bad faith based on

Zurich's alleged failure to pay the plaintiff UM benefits (Doc. 48, p. 4; <u>see</u> Doc. 48-3, pp. 1-6).  On October 19, 2004, Zurich sent the plaintiff a check for $500,000 (Doc. 48, p. 4).  Thereafter, on September 8, 2006, the plaintiff and Zurich settled the case.[2]

Under Schedule A of the defendant's umbrella policy, the defendant and Zurich are listed as underlying carriers for UM benefits (Doc. 2-2, p. 11; Doc. 63-2, p. 4).  Schedule A lists Zurich's and the defendant's minimum primary limits as $500,000 for each occurrence (<u>id</u>.).  Under the defendant's primary policy's declarations, UM's limits are listed as $15,000 per person and $30,000 per occurrence (Doc. 2-2, p. 1).  The defendant has already paid $30,000 to the plaintiff (Doc. 2, p. 3, ¶16).

The plaintiff contends that, pursuant to the definition under the defendant's umbrella policy, the retained limit is the sum of defendant's primary policy UM limit of $30,000, plus Zurich's UM limit of $500,000, for a total of $530,000 (Doc. 48, pp. 5, 9-11; Doc. 74, pp. 6-9).  The plaintiff argues in this respect that the Zurich policy provided non-stacking coverage, therefore, the limit of the UM benefits under that policy is $500,000 (Doc. 48,

---

[2]The settlement agreement between the plaintiff and Zurich has been filed under seal with this court (Doc. S-3).  Accordingly, the settlement amount will not be mentioned in this report and recommendation since the amount is unnecessary to a determination of the retained limit.

pp. 11-15; Doc. 74, pp. 1-6;  Doc. 88, pp. 2-15).   Moreover, the plaintiff asserts that any settlement amount Zurich paid him on the bad faith claim cannot be included within the definition of the "retained limit" under the defendant's umbrella policy (Doc. 48, pp. 6-19).   Consequently, the plaintiff asserts that the excess coverage under the defendant's umbrella policy is triggered after damages reach $530,000.

The defendant counters that the Zurich policy provided stacking UM benefits at $500,000 for 145 vehicles, and therefore, that policy provided coverage of $72,500,000 (Doc. 63, pp. 2-3, 5-11; Doc. 81, pp. 2, 4, 6-8).  It is the defendant's position that, since the plaintiff settled with Zurich for an amount less than that, the plaintiff has not exhausted the UM benefits under Zurich's policy's coverage.

In the alternative, the defendant argues that it is entitled to an equitable set-off and/or a set-off under §46.015, Fla. Stat., for the full amount of the plaintiff's settlement with Zurich (Doc. 63, pp. 3, 11-15; Doc. 81, pp. 4-5, 17-21).   It is the defendant's position that the plaintiff has been compensated for his injuries with that settlement (Doc. 81, pp. 4-5, 17-21).

In his motion for partial summary judgment, the plaintiff has also asserted a separate argument.  The plaintiff contends that the defendant at trial

cannot maintain the affirmative defense that he failed to wear an operational seat belt (Doc. 48, pp. 21-25).  The plaintiff argues that he was seventeen years old at the time of the accident so that as a minor he cannot be faulted for not wearing a seat belt under the Florida Safety Belt statute, §316.614, Fla.Stat. (id.).  It is the plaintiff's position that under §316.614, Fla.Stat., it is the driver's duty to ensure that the plaintiff, as a minor, was wearing a seat belt (id. at p. 23).  The defendant counters that it may set forth a common law affirmative defense of comparative negligence based on the plaintiff's failure to wear an operational seat belt (Doc. 63, pp. 15-22).

The parties' motions were referred to me for a report and recommendation (Docs. 67, 85).  Thereafter, a hearing was held on the motions.

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  F.R.Civ.P. 56(c).  Material facts are those over which disputes "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes about material facts are genuine "if the evidence

is such that a reasonable jury could return a verdict for the [opposing] party."
Id.  The movant bears the burden of establishing the absence of a dispute over
material facts.  Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469
(11th Cir. 1993).

When the party moving for summary judgment has the burden of
proof at trial, it must affirmatively show the absence of a genuine issue of
material fact by presenting credible evidence that would entitle it to a directed
verdict if the evidence was not controverted at trial.  United States v. Four
Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991).  If the moving
party does not meet its burden, then the motion for summary judgment will be
denied.  Id. at 1437-38.  If the movant  meets its initial burden, then it is
entitled to summary judgment unless the opposing party comes forward with
"significant probative evidence demonstrating the existence of a triable issue
of fact."  Id. at 1438.

When the party moving for summary judgment does not have the
burden of proof at trial, that party may discharge its initial burden by
identifying specific portions of the record which show the absence of evidence
to prove the opposing party's case at trial, or, alternatively, it may come
forward with "affirmative evidence demonstrating that the [opposing] party

will be unable to prove its case at trial." Id.  If this burden is not met, then the motion for summary judgment will be denied.  Id.

When the moving party meets its initial burden, the burden then shifts "to the [opposing] party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment.  Id.

III.

The plaintiff in his motion for summary judgment contends, as indicated, that the retained limit of the defendant's umbrella policy is $530,000, and that the defendant's excess coverage begins at that point.  In

connection with this contention, the plaintiff makes a lengthy argument that the retained limit does not include the bad faith settlement he received from Zurich (Doc. 48, pp. 11-20).  In response, however, the defendant does not contend that the retained limit includes that amount.  Consequently, any such contention is properly deemed abandoned.  The defendant, rather, makes a different argument concerning the retained limit based on stacking.

The defendant argues that Zurich's policy provided stacking UM coverage totaling $72,500,000, and that its umbrella policy is not implicated until the plaintiff's damages reach above that amount (by $30,000) (Doc. 63, pp. 2-3, 5-11; Doc. 81, pp. 2, 4, 6-8).  The defendant calculates this figure by multiplying the number of vehicles covered under the Zurich policy (145) by the policy limit ($500,000) to equal $72,500,000 (Doc. 81, pp. 2, 4, 10). Therefore, the defendant asserts that the plaintiff, who settled with Zurich for an amount far less than $72,500,000, has not exhausted Zurich's primary policy limit and, consequently, cannot seek coverage from the defendant under its umbrella policy (Doc. 63, pp. 5-11; Doc. 81, pp. 10-17).

The plaintiff does not dispute that the wording of the Zurich policy as issued provides stacking UM coverage (Doc. 74, p. 2).[3]  However,

_____

[3]KDC purchased from Zurich a commercial automobile policy in 2001 with policy number BAP 3495301-01 (Doc. 74, p. 2).   KDC then renewed its policy with Zurich for

the plaintiff maintains that it was a mistake for the Zurich policy to be issued with UM stacking coverage and that KDC and Zurich intended that the policy provide non-stacking coverage (id. at pp. 1-6).  Based upon the evidence in the record, the defendant's position is unavailing.

The terms of Zurich policy number BAP 3495301-02 expressly provide for stacking coverage (Doc. 48-4, p. 16; Doc. 63-4, p. 24).  The plaintiff, however, has set forth clear and convincing evidence that a mutual mistake occurred and that it was Zurich's and KDC's intention for the policies to provide non-stacking UM limits of $500,000.  Thus, in the settlement agreement between Zurich and the plaintiff, Zurich acknowledged that it was its intention to issue a policy that provided non-stacking UM coverage (S-3).  The plaintiff's evidence confirms this intent and explains how the mistake occurred.

Kyle Joseph Chrietzburg, the secretary, treasurer and vice president of KDC, was in charge of purchasing insurance for the company (Doc. 76, p. 1).  KDC's insurance agent was Russell Steven Ayers, who

---

the period of July 2002 through July 2003.  The renewal policy number is BAP 3495301-02 and was the policy in effect at the time of the plaintiff's accident.  Both policies provided stacking UM coverage.  It is the plaintiff's position that the original Zurich policy should have been issued as non-stacking because applications were submitted rejecting stacking UM coverage.  Therefore, the renewed Zurich policy should also have been for non-stacking UM coverage (id. at pp. 2-6).

worked for Brown and Brown Insurance (<u>id</u>. at p. 2; Doc. 78, p. 4). Through Ayers of Brown and Brown, KDC purchased the commercial automobile policies from Zurich (Doc. 76, p. 2).  According to Chrietzburg, when KDC purchased the original Zurich commercial automobile policy bearing policy number BAP 3495301-01, it was KDC's intent for the policy to provide non-stacking UM benefits with a limit of $500,000 per accident (<u>id</u>. at pp. 2, 3). Chrietzburg states that, with respect to the original Zurich policy, he, on behalf of KDC, along with the plaintiff and other Kearney family members, executed applications selecting UM coverage with non-stacking limits (<u>id</u>. at p. 2; Docs. 76-2 - 76-6).  KDC executed an application on June 22, 2001, and the plaintiff signed an application on June 26, 2001(Doc. 76-3; Doc. 76-4). Chrietzburg states further that policy number BAP 3495301-02 renewed policy number BAP 3495301-01 for the period of July 1, 2002, through July 1, 2003, and that KDC made no request to change the policy coverage for the UM benefits (Doc. 76, p. 2).

The applications that were executed for the selection of non-stacking UM benefits support Chrietzburg's testimony that the original policy issued by Zurich was to provide for non-stacking UM coverage.   The

applications are entitled "Florida - Supplementary Application" (see, e.g.,

Doc. 76-4).  The first paragraph states (see id.):

> YOU ARE ELECTING NOT TO PURCHASE
> CERTAIN VALUABLE COVERAGE WHICH
> PROTECTS YOU AND YOUR FAMILY OR
> YOU ARE PURCHASING UNINSURED
> MOTORIST LIMITS LESS THAN YOUR
> BODILY INJURY LIABILITY LIMITS WHEN
> YOU SIGN THIS FORM.  PLEASE READ
> CAREFULLY.

The applications further provide (see id.):

> IF YOU ARE AN INDIVIDUAL INSURED, YOU
> HAVE THE OPTION OF REJECTING THE
> STACKING OF LIMITS IN CONSIDERATION
> OF REDUCED RATES.  IN THIS CASE, IF THE
> LIMITS OF LIABILITY FOR UNINSURED
> MOTORIST COVERAGE SHOWN ON THE
> POLICY IS $30,000, THEN THE AMOUNT OF
> UNINSURED MOTORIST INSURANCE IS
> $30,000, REGARDLESS OF THE NUMBER OF
> VEHICLES.

KDC, along with the Kearney family members, including the plaintiff,

checked section (c) on the applications. Section (c) states (see id.):

> As an individual named insured (Class l), I hereby
> reject the stacking of limits under Uninsured
> Motorists coverage and select the non-stacking of
> limits.

These forms demonstrate that KDC, along with the Kearney family members,

rejected stacking UM coverage.

In addition, Ayers' testimony corroborates Chrietzburg's statements.  According to Ayers, who was intimately familiar with the policies, he was informed by Brown and Brown's account manager, Maureen Sherman, that Zurich had erroneously issued the policy as providing stacked coverage (Doc. 78, pp. 53, 54).  Thus, Sherman had sent Zurich a letter regarding policy number BAP 3495301-02 stating that the UM benefits coverage should be corrected to non-stacking as indicated on the signed UM election forms (Doc. 78-9, p. 6, Ex. F).[4]  Ayers was also informed that Brown and Brown never received from Zurich a corrected endorsement form reflecting the change to non-stacking coverage (Doc. 78-4, pp. 7, 9).

Ayers further explained that, in line with industry standards, ordinarily a company with numerous units is not able to purchase stacked UM benefits (id. at p. 10).  Thus, Ayers said that he has "never really seen a large fleet policy issued with stacked limits" (id.).  Ayers added that the cost to KDC to purchase stacked UM benefits would have been prohibitive (id.).

---

[4]Sherman's letter to Zurich is dated October 21, 2002 (Doc. 78-9, p. 6, Ex. F), which is after the plaintiff's accident in July 2002.  However, as explained, the plaintiff, along with KDC and other Kearney members, had the previous year selected non-stacking UM coverage for the original Zurich policy and no changes were made to alter that coverage.

Moreover, according to Ayers, when Zurich's policy was renewed for the period of July 1, 2002, through July 1, 2003, Zurich did not request that new forms be signed regarding UM coverage (Doc. 78-3, pp. 8, 9). In this respect, the plaintiff correctly points out that, pursuant to §627.727(9), Fla. Stat., the plaintiff (and the other insureds) did not have to complete a new application form for the renewed policy selecting non-stacking coverage (Doc. 74, p. 4). Therefore, the election of non-stacking UM coverage in policy number BAP 3495301-01did not change with respect to renewal policy number BAP 3495301-02 (Doc. 78-3, p. 10).

These circumstances clearly establish that the indication of stacked UM coverage in the Zurich policy resulted from a mistake. That mistake was in the nature of a scrivener's error. Such a mistake can be reformed to reflect the true intent of the parties.

A contract may be reformed in equity when, due to the parties' mutual mistake, the contract does not set forth the parties' true intention or agreement. Tobin v. Michigan Mutual Insurance Co., 948 So.2d 692, 696 (Fla. 2006); Providence Square Association, Inc. v. Biancardi, 507 So.2d 1366, 1370 (Fla. 1987); Lighting Fixture and Electric Supply Co. v. The Continental Insurance Co., 420 F.2d 1211, 1214 (5th Cir. 1969). Florida law

considers a mutual mistake to occur "when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument." <u>Providence Square Association, Inc.</u> v. <u>Biancardi</u>, <u>supra</u>, 507 So.2d at 1372. Therefore, reformation of a contract does not alter the agreement, but rather  reflects the actual agreement that the parties intended to enter.  <u>Id</u>. at 1370.  Consequently, parol evidence is admissible to demonstrate that the parties intended an agreement different from the terms that are written in the contract.  <u>Id</u>. at 1371; <u>Allstate Insurance Co.</u> v. <u>Vanater</u>, 297 So.2d 293, 296 (Fla. 1974).  In this respect, the party wishing to demonstrate mutual mistake bears the burden of showing the mistake by clear and convincing evidence.  <u>Allstate Insurance Co.</u> v. <u>Vanater</u>, <u>supra</u>, 297 So.2d at 296.

The defendant responds that Zurich is a necessary party to these proceedings in order for the Zurich policy to be reformed and that, since Zurich is not a party, the contract cannot be reformed (Doc. 81, pp. 8-9).  This contention is incorrect.

In Florida, an independent action for reformation is not required to obtain relief from a mutual mistake.  <u>Milford</u> v. <u>Metropolitan Dade County</u>, 430 So.2d 951, 952 (Fla. App. 1983).  Rather, if there is a mistake in reducing

an agreement to writing, equity will provide appropriate relief "either by way of defense to its enforcement, or by cancellation, or by reformation." Alexander v. Kirkham, 365 So.2d 1038, 1040 (Fla App. 1978)(quoting Jacobs v. Parodi, 50 Fla. 541, 39 So.2d 833, 836-37 (1905)).  Thus, for more than one hundred years it has been the law of Florida that, "if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive...." Id. (emphasis omitted).  Accordingly, it has been held that a release from liability can be modified due to mutual mistake despite the lack of a claim for reformation.  Fisher v. Clarizio, 736 So.2d 130 (Fla. App. 1999); see also Alexander v. Kirkham, supra (appellate court reformed the release agreement even though the trial court had dismissed a reformation claim as moot).

In Florida, therefore, a claim for reformation is not a sine qua non to a correction of an agreement that contains a mutual mistake.  Consequently, in this case the court can appropriately achieve equity by declining to enforce the provision in the Zurich insurance policy regarding the stacking of UM coverage.

Regarding the equities of the situation, the following language from Alexander v. Kirkham, supra, 365 So.2d at 1040-41, in which the court

refused to enforce the terms of a release agreement that mistakenly released certain parties from liability, is apropos (footnote and internal citations omitted):

> It must be pointed out that the defendants in this case were neither parties to the release agreement, gave any consideration for it, or changed their position in any way in reliance upon its terms. ... They simply seek to be the donee beneficiaries of an enormous benefit, freedom from tort liability, gratuitously placed in their laps through the inadvertence of third parties.  On these facts there is therefore no legal or equitable reason to interfere with the effectuation of the conceded intention of the parties to the agreement themselves.

Similar reasoning applies forcefully here.  The defendant was paid a premium to provide umbrella coverage once the plaintiff's damages exceed $530,000.  As a result of a mistake in the preparation of the Zurich policy – a mistake which both parties to the policy agree occurred – the defendant, who is a stranger to the Zurich policy, asserts that it should not have to honor its contractual agreement until the plaintiff's damages exceed $72,530,000, an extremely improbable event.  No notion of equity would countenance such a result.  Accordingly, there is no justification for

concluding that the plaintiff has not exhausted the retained limits of Zurich's policy.[5]

IV.

In its motion, the defendant claims on two grounds a set-off against plaintiff's damages as a result of the bad faith settlement the plaintiff received from Zurich.  Neither ground supports summary judgment.

The defendant contends first that it "is entitled to a set off based on the general principles of equity" (Doc. 81, p. 19).  In this respect, the defendant claims that the plaintiff has already been fully compensated for his personal injuries in the Zurich settlement and should not be entitled to recover twice for the same injuries.  At the hearing, plaintiff's counsel conceded that the plaintiff is alleging the same injuries in this case as he did in his case against Zurich.

The defendant has not cited any case on this point, and, thus, it obviously has not provided any authority even hinting that the fact that the plaintiff is seeking recovery from the insurers for the same damages in both

---

[5]The defendant has recently submitted a supplemental authority indicating that, in contract interpretation matters, Florida rejects the doctrine of reasonable expectations of the parties (Doc. 112). See Lenhart v. Federated National Ins. Co., 950 So.2d 454 (Fla. App. 2007).  That authority is inapposite since the plaintiff does not rely upon that doctrine in asserting that the mistake in the Zurich policy should be disregarded.

lawsuits supports a set-off under general principles of equity (see id. at pp. 17-19).  In contrast, the plaintiff cites Florida cases holding that the principle of equitable set-off is limited to the situation where two parties each have a claim against the other (Doc. 74, pp. 9-10).  See, e.g., Everglade Cypress Co. v. Tunnicliffe, 148 So. 192, 193 (Fla. 1933).

Not only has the defendant failed to present any legal authority supporting its claim of an equitable set-off, it has also failed to explain how the set-off would work.  At this point, there is no basis for concluding that the settlement from Zurich would be taken into account prior to the beginning of coverage by the defendant's umbrella policy.  Thus, the defendant's stacking argument has been rejected with the conclusion that the defendant's policy comes into play upon the finding of damages above $530,000.  Furthermore, while the plaintiff anticipated that the defendant would contend that the Zurich settlement amount should be considered as part of the retained limit and thus needed to be exhausted before the defendant's excess coverage would take effect, the defendant did not raise that argument, thereby abandoning it.

Under these circumstances, the only situation I can perceive where a set-off would come into play is if the plaintiff received a damage

award that is greater than the sum of $530,000, plus the Zurich settlement amount, and the defendant is found liable on the plaintiff's bad faith claims. Plaintiff's counsel indicated that, in that circumstance, the defendant would be entitled to a credit.

Finally, on this issue, it is appropriate to add that there are no equitable considerations warranting a set-off, except in the circumstance I just mentioned. As plaintiff's counsel persuasively pointed out at the hearing, the defendant entered into a contract to provide excess coverage above the retained limit. Since the insureds paid the premiums as their part of the bargain, there appears no valid reason to permit the defendant to avoid its part of the bargain. Equity does not require that the defendant receive such a windfall.[6]

The defendant's second argument regarding a set-off is predicated upon §46.015(2), Fla. Stat. That subsection provides:

---

[6]Arguably, the plaintiff could have a double recovery for the same injuries if his damages were found to be between $530,000 and $5,530,000. That possibility, however, does not support summary judgment for the defendant on its equitable set-off claim. In the first place, the defendant, as indicated, has not provided any legal authority that would justify an equitable set-off. Moreover, if the plaintiff's damages fall in that range, that would mean that the plaintiff negotiated a very favorable settlement with Zurich. There is no apparent reason why the defendant, rather than the plaintiff, should be the beneficiary of that favorable settlement. Finally, the conjectural nature of the possible damage finding makes a summary judgment on that point premature and thus unwarranted.

At trial, if any person shows the court that the plaintiff, or his or her legal representative, has delivered a written release or covenant not to sue to any person in partial satisfaction of the damages sued for, the court shall set off this amount from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment.

That provision could possibly be a basis for a set-off at the conclusion of the case.  But see Wells v. Tallahassee Memorial Regional Medical Center, Inc., 659 So.2d 249, 253 (Fla. 1995) (" ... section 46.015 does not apply to noneconomic damages").  By its terms, however, it is not a provision that can be the basis for a pretrial motion for summary judgment.  Consequently, the defendant's reliance on that provision is premature.

For these reasons, the defendant is not entitled to summary judgment on its claims for a set-off.

V.

The plaintiff also seeks partial summary judgment on the defendant's fifth affirmative defense, which asserts that the plaintiff's injuries and damages were caused, or substantially contributed to, by the plaintiff's failure to wear a seat belt (Doc. 48, pp. 20-25).  This contention lacks merit.

The plaintiff asserts that the seat belt defense does not apply to him because he was seventeen years old at the time of the accident and, under

§316.614, Fla. Stat., the duty fell upon the driver of the vehicle to ensure that

he, as a minor (albeit one with a driver's license), was restrained by a seat belt

(id.). Thus, §316.614(4), Fla. Stat., provides:

> It is unlawful for any person:
>
> (a) To operate a motor vehicle in this state unless each passenger and the operator of the vehicle under the age of 18 years are restrained by a safety belt or by a child restraint device pursuant to s. 316.613, if applicable ...

The plaintiff contends that, because he could not have violated this statute, he

cannot be found to have been comparatively negligent in failing to use a seat

belt.  The defendant responds that, notwithstanding §316.614(4), Fla. Stat.,

it is entitled to a common law seat belt defense, although it is not entitled to

a jury instruction pertaining to a traffic violation.

A chronology of the seat belt defense in Florida aids an

understanding of this issue.  The Florida Supreme Court established a

common law seat belt defense in Insurance Company of North America v.

Pasakarnis, 451 So.2d 447 (Fla. 1984).  In 1986, the Florida legislature

enacted the Florida Safety Belt law and, four years later, amended that law.

The 1990 amendment included a provision that a violation of §316.614, Fla.

Stat., should not be considered in mitigation of damages but may be

considered as evidence of comparative negligence in any civil action.   In Ridley v. Safety Kleen Corp., 693 So.2d 934 (Fla. 1996), the Florida Supreme Court analyzed the effect of the legislative enactments upon the common law seat belt defense.   In 2000, the Safety Belt law was amended again, this time raising the age from sixteen to eighteen at which passengers must be restrained before a person can operate a vehicle.

The plaintiff's argument is that "[t]he combined effect of the 1990 amendment to section 316.614(10) and the Supreme Court's decision in Ridley is that the seat belt defense in Florida is grounded solely on the theory that a violation of a traffic regulation, specifically, section 316.614, may be considered as evidence of negligence.   Therefore, a defendant may not rely upon a plaintiff's failure to use a seat belt to reduce the plaintiff's recovery unless the plaintiff himself committed a violation of section 316.614" (Doc. 48, pp. 22-23).   The plaintiff, moreover, asserts that Ridley "abrogated" Pasakarnis (id., p. 21).   This argument is based upon a clear misreading of Ridley.

In Ridley, the Florida Supreme Court stated (693 So.2d at 941)(footnotes omitted):

> The amendment of section 316.614 in 1990 has led
> some to conclude that the legislature meant to do

away with the use of the seat belt defense in civil actions as established in <u>Pasakarnis</u>.  However, our review of the amended statute and its legislative history leads us to conclude that the statute was not intended to alter the <u>Pasakarnis</u> rule.  Rather, we believe that the 1990 amendment was enacted to clarify and standardize the manner in which a plaintiff's failure to use a seat belt was to be utilized in a civil action, and to preclude the possibility that an injured plaintiff would be penalized twice for failing to use an available seat belt.  With the amendment in 1990, the legislature achieved this end by limiting the use of evidence of a plaintiff's failure to use a seat belt to only one issue – comparative negligence.

The Supreme Court said further that it agreed with other authorities "that treating the seat belt issue as one of comparative negligence serves to simplify resolution of the single issue of whether a person's failure to use a seat belt has contributed to her injuries." <u>Id</u>. at 943.  Accordingly, the Court held "that this issue should ordinarily by raised by an affirmative defense of comparative negligence." <u>Id</u>.

<u>Ridley</u> essentially reaffirms the common law seat belt defense established in <u>Pasakarnis</u>.  Consequently, <u>Ridley</u> does not provide any support for the plaintiff's contention that the seat belt defense in Florida is grounded solely upon a violation of a traffic regulation.[7]

---

[7]It is noted that the plaintiff does not contend that his theory is supported by the 2000 amendment to the Safety Belt law.  In all events, since the 1990 amendment did not

-24-

The Supreme Court in <u>Ridley</u> explained that, "[i]n the future, trial courts should give the jury Standard Jury Instruction (Civil) 3.8a (contributory negligence), 4.11 (violation of traffic regulation evidence of negligence), and 6.1(c) (when there is an issue of contributory negligence), but not 6.14 [regarding failure to use a seat belt], since the seat belt issue is to be treated as part of the comparative negligence issue." <u>Id</u>. (footnote omitted).  In this case, as the defendant acknowledges, it is not entitled to instruction 4.11 regarding violation of a traffic regulation.  However, the other instructions that were identified provide a basis for presenting a seat belt defense to the jury, and the defendant is entitled to those instructions.

Therefore, the plaintiff's summary judgment motion regarding the seat belt defense should be denied.

## VI.

For the foregoing reasons, I recommend that the plaintiff's motion for partial summary judgment (Doc. 48) be granted to the extent that the retained limit under the defendant's umbrella policy is found to mean that the umbrella policy provides coverage above $530,000.  Further, I recommend that the plaintiff's partial motion for summary judgment be

---

limit the seat belt defense to instances involving violations of §316.614, there is no reason to think the 2000 amendment did.

denied with respect to a seat belt defense. In addition, I recommend that the defendant's motion for partial summary judgment (Doc. 81) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JULY 18, 2007


## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).