UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLAYTON KEARNEY,

Plaintiff,

v. Case No. 8:06-cv-595-T-24TGW

AUTO-OWNERS INSURANCE COMPANY,

Defendant.
_____________________________________/

**O R D E R**

This cause comes before the Court on Defendant's Motion for New Trial, or Alternatively, For Remittitur. (Doc. No. 275.) Plaintiff has filed a response in opposition. (Doc. No. 292.)

**I. Background**

On July 27, 2002, Plaintiff Clayton Kearney ("Kearney") was a passenger in an uninsured motor vehicle that was involved in an accident in which Kearney suffered serious bodily injuries. At the time of the accident, three insurance policies provided Kearney with uninsured motor vehicle ("UM") coverage:

(1) a Commercial Auto policy issued by Zurich American Insurance Company ("Zurich"), providing primary UM coverage of $500,000 for each occurrence;

(2) a Recreational Vehicle Policy issued by Defendant Auto-Owners Insurance Company ("Auto-Owners"), providing primary UM coverage of $30,000 for each occurrence; and

(3) an Umbrella Policy issued by Auto-Owners, providing UM coverage of $5,000,000 for each occurrence in excess of the retained limit of the policy.

Kearney filed suit against Zurich in state court, in an action styled *Clay Kearney v. Anthony David Sorrentino and Zurich American Insurance Company*, case number 04-CA-003457 (the "Zurich lawsuit"). (Doc. No. 48-3.) In the Zurich lawsuit, Kearney sought to recover the full amount of his damages covered under Zurich's UM Commercial Auto policy, as well as his total damages suffered as a result of the accident and as a result of Zurich's bad faith and unfair claims handling practices. On October 19, 2004, Zurich paid Kearney $500,000, the limits of the UM coverage under the Commercial Auto policy. On September 8, 2005, Kearney entered into a settlement agreement with Zurich, resolving all disputes between them relating to the accident and the Commercial Auto policy, Zurich's handling of Kearney's claim, and any other claims that were or could have been asserted in the Zurich lawsuit.[1]

After Kearney reported his claim to Auto-Owners, Auto-Owners tendered to Kearney the $30,000 in UM coverage under the Recreational Vehicle Policy, but initially refused to tender the $5,000,000 in UM coverage under the Umbrella Policy. In response, on February 24, 2006, Kearney filed a four-count complaint against Auto-Owners in state court. (Doc. No. 2.) On April 7, 2006, Auto-Owners filed its notice of removal. (Doc. No. 1.) Kearney's initial complaint against Auto-Owners asserted four separate counts: Count I was a claim for additional UM benefits under the Recreational Vehicle Policy; Count II was a claim for UM benefits under the Umbrella Policy; Count III was a claim for bad faith handling of Kearney's claim under the Recreational Vehicle Policy; and Count IV was a claim for bad faith handling of Kearney's

[1]The amount of this settlement is confidential, but has previously been disclosed to the Court in documents filed under seal.

claim under the Umbrella Policy. During the course of litigation in this action, Auto-Owners tendered to Kearney the $5,000,000 in UM coverage under the Umbrella Policy.

At the time of trial, the only Count that remained was Count IV of Kearney's complaint for Auto-Owners' bad faith handling of his claim under the Umbrella Policy.[2] However, because the parties had agreed to defer resolution of Kearney's bad faith claim until the issues of policy coverage, liability, and damages had been resolved, the Court bifurcated the liability and damage issues from the bad faith issues. This Court held a jury trial on liability and damages in November of 2007.

On the first day of trial, Kearney informed the Court that he was dropping his prior claims for damages in the form of: (1) past and future medical bills; (2) loss of past earnings; (3) loss of the ability to enjoy life; and (4) and future pain and suffering, disability, physical impairment, disfigurement, or mental anguish. The only remaining damages to be determined by the jury were Kearney's damages for future lost earning ability and his damages for past pain and suffering, disability, physical impairment, and disfigurement or mental anguish.[3] Following the trial, the jury returned a verdict determining that Kearney was contributorily negligent in failing to wear a seatbelt, and that his share of negligence was twenty percent (20%). (Doc. No. 262.) The jury also determined that Kearney's damages for future lost earning ability was

---

[2]On August 2, 2007, the parties filed a joint stipulation for the dismissal of counts I and III of Kearney's complaint. (Doc. No. 138.) On August 3, 2007, the Court entered an order dismissing Counts I and III of Kearney's complaint with prejudice. (Doc. No. 139.) On November 11, 2007, Kearney filed a motion to voluntarily dismiss Count II of his complaint with prejudice (except any claim for attorney's fees and taxable costs related thereto) (Doc. No. 237), which the Court granted on November 5, 2007 (Doc. No. 243).

[3]While Kearney sought damages for his past pain and suffering, disability, physical impairment, and disfigurement or mental anguish, the Court will refer to these damages simply as "pain and suffering" throughout the rest of this Order.

$35,000,000, and that his damages for past pain and suffering was $25,000,000. (Doc. No. 262.) Accounting for Kearney's 20% of contributory negligence, the total amount of damages awarded was $48,000,000.

On November 26, 2007, Auto-Owners filed the instant motion, and on December 10, 2007, Kearney responded. On January 8, 2008, this Court held a hearing on Auto-Owners' motion and heard oral argument from both parties on the subject.

## II. Discussion

Auto-Owners has moved for a new trial pursuant to Federal Rule of Civil Procedure 59, claiming that the evidence adduced at trial does not support the jury's award for future lost earning ability and past pain and suffering. In the alternative, Auto-Owners seeks a remittitur of both damage awards on the grounds that neither is supported by the record.

Rule 59 of the Federal Rules of Civil Procedure does not enumerate all the grounds for a new trial but speaks instead in broad terms. 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2805 (2d ed. 1995). Pursuant to Rule 59(a), "[a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." A party may seek a new trial by arguing that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of the alleged substantial errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). "The burden of showing the existence of harmful prejudice rests on the moving party." Richardson v. Bombardier, Inc., 2005 WL 3087864, at *6 (M.D. Fla. Nov. 16, 2005)(citations

omitted).

In the instant case, Auto-Owners argues that it is entitled to a new trial, or alternatively, a remittitur of the jury's verdict, because the damages awarded for past pain and suffering and for future lost earning ability were excessive. In this diversity case, the federal "shock the conscience" test for an excessive jury award does not apply. Instead, the Court must look to Florida law to determine whether the jury's award is excessive. Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1446 (11th Cir. 1991) (citing Quality Foods, Inc. v. U.S. Fire Ins. Co., 715 F.2d 539, 542 n. 2 (11th Cir. 1983)). If the jury's award is found to be excessive under Florida law, the Court must then look to federal law to determine the procedural question of whether a new trial or remittitur is warranted. Id.

Motions for remittitur under Florida law are governed by statute. Auto-Owners argues that Section 768.74 of the Florida Statutes is applicable, and Kearney argues that Section 768.043 is applicable. Section 768.74 applies generally to negligence actions, and Section 768.043 applies to actions arising out of the operation of motor vehicles. The Court notes that there is hardly any difference between Sections 768.74 and 768.043. However, because the instant case does arise out of the operation of a motor vehicle, Section 768.043 is applicable. The factors set forth in Section 768.043 for determining whether an award is excessive or inadequate are:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact.
>
> (b) Whether it clearly appears that the trier of fact ignored the evidence in reaching the verdict or misconceived the merits of the case relating to the amounts of damages recoverable.
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation or conjecture.
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages

> proved and the injury suffered.
>
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

It is important to note that a court should not "declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." Bould v. Touchette, 349 So. 2d 1181, 1184-85 (Fla. 1977). Rather, "[t]he verdict should not be disturbed unless it is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." Id. In that event, the verdict should be "reduced to the highest amount which the jury could have properly awarded." Rety v. Green, 546 So. 2d 410, 420 (Fla. 3d DCA 1989) (internal quotations omitted).

Under the standard set forth above, the Court finds that the jury's award for past pain and suffering clearly exceeds the maximum limit of a reasonable range within which the jury might operate, that the amount of the award is indicative of prejudice or passion on the part of the jury, and that the jury took improper elements of damages into account when determining the award. As for the jury's award for future lost earning ability, the Court concludes that a remittitur is not warranted.

*Past Pain and Suffering*

Briefly, the evidence adduced at trial showed the following: at the time of the accident, Kearney was seventeen years old. Kearney suffered a traumatic closed-head injury and was unconscious for eight days following the accident. Kearney was hospitalized for forty-two days, which includes time spent at the hospital's rehabilitation center. During the approximately five years between the accident and the trial, Kearney has suffered from: some right shoulder pain; loss of his sense of smell; some slowness in manual speed and dexterity; depression; short term memory loss; and loss of executive function. Following the accident, Kearney was able to

graduate from Admiral Farragut Acadamy high school, which was the same school he was attending prior to the accident. Kearney attempted college at the University of Tampa, but was unable to obtain a degree due to his poor grades, although his IQ post-accident is in the average range.[4] Kearney is currently employed at his father's business as an assistant building superintendent, where he is given a checklist of items to inspect in various buildings to see whether they are working properly. He has taken medication for depression, although not regularly. Likewise, Kearney has seen a psychiatrist, although not regularly. After the accident Kearney suffered little or no pain, and is not now physically impaired, disabled, or scarred. He does not have headaches, lives independently, drives a car, plays sports, and is able to maintain some form of employment.

In determining the appropriate award for pain and suffering, the jury was to only consider Kearney's *past* pain and suffering for the five years before the trial, not his *ongoing* or *future* pain and suffering. While most of Kearney's closing argument focused on his future lost earning ability, Kearney's counsel did argue several times that Kearney's pain and suffering was ongoing. For instance, when discussing Kearney's reliance on medication, Kearney's counsel argued to the jury that "[t]hat's hard when you're 23, to think that *for the rest of his life* he's going to have to be taking these medicines." (Doc. No. 283 at 21, emphasis added.) Then, when discussing Kearney's depression and loss of cognitive ability, Kearney's counsel stated that, "[f]ortunately, he did not commit suicide, but *these problems have not gone away*. They've not gone away. *They're an ongoing problem*." (Id. at 24, emphasis added.) Kearney's counsel also directed the jury's attention to one psychiatrist's evaluation of Kearney stating that "[h]e

---

[4]Kearney was able to complete two semesters of course-work at the University of Tampa. After his second semester, Kearney's father received notice from the university that Kearney had essentially failed out of school and would not be permitted to continue his education there.

continues to have difficulty with day-to-day functioning, and makes unwise and impulsive decisions . . . [h]e [is] coping with low self-esteem and concern regarding a productive future." (Id. at 25.)

The Court would agree with Kearney that, for the most part, the witnesses who testified at trial and Kearney's counsel made no attempt to improperly appeal to the jury's sympathy or prejudice. The one exception, however, was when Kearney's counsel compared Kearney to a young lion during closing arguments:

> He has said many times that he feels like a caged animal. You'll see that over and again in the records. He's like a caged animal who understands what he's lost, one that wasn't born in the zoo, wasn't born in a cage, but he comes from the Serengeti. A young lion where he's out learning to kill for himself, learning to support himself, taking nature's ways.
>
> And now they've caged him in a zoo and they bring him his bucket of food - - and put his food in a bucket.
>
> That's not the same. And he knows. He's got his intelligence. He knows in his darkest moments when he is alone and he looks inside himself, his intelligence is high enough for him to remember how drastically, drastically changed his life since they put him in this cage.

(Id. at 35-36.)

The jury awarded Kearney $25,000,000 in damages for past pain and suffering over a period of approximately five years. The Court finds that the jury's verdict greatly exceeds the maximum limit of the reasonable range within which the jury could operate. Indeed, it is clear to this Court that a $25,000,000 award for five years of pain and suffering is a "haywire or runaway jury verdict which is not sustainable under any reasonable view of the evidence." Rety, 546 So. 2d at 420. While the Court harbors no doubt that Kearney's pain and suffering during the last five years was significant, an award of $25,000,000 strikes the Court as shockingly excessive.

The evidence presented regarding Kearney's past pain and suffering and the statements

by counsel referenced above, coupled with the jury's inordinately large award, provide the Court with sufficient evidence upon which it concludes that: (1) the jury's award was not supported by the evidence and could not have been adduced in a logical manner by reasonable persons; (2) the jury erroneously took into account Kearney's ongoing and future pain and suffering; and (3) the jury was inappropriately influenced by prejudice or sympathy. FLA. STAT. § 768.043 (2008). In other words, the Court concludes that the jury's award was so "inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." Bould, 349 So. 2d at 1184-85.

Having found the jury's award for past pain and suffering to be excessive, the question now before the Court is whether to grant a new trial or remittitur. A federal court has no general authority to reduce the amount of a jury's verdict. Johansen v. Combustion Engineering, Inc., 170 F.3d 1320, 1328 (11th Cir. 1999) (citing Kennon v. Gilmer, 131 U.S. 22, 29 (1889)). "The Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury." Id. A district court may, however, order a new trial – "[a] court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award." Id. (citing Dimick v. Schiedt, 293 U.S. 474, 486-87 (1935)). As such, Kearney must be given the option of a new trial in lieu of remitting a portion of the jury's award for damages for past pain and suffering.

At trial, Kearney never suggested to the jury an appropriate amount of damages for his past pain and suffering, preferring instead to leave the amount unnamed. Upon careful consideration of all of the evidence, the entire record in this case, as well as other cases involving significant injuries with substantial pain and suffering, the Court concludes that "the highest amount which the jury could have properly awarded" in this case is $2,500,000. Rety v.

Green, 546 So. 2d 410, 420 (Fla. 3d DCA 1989) (quoting Lassitter v. Int'l Union of Operating Eng'rs, 349 So. 2d 622, 627 (Fla. 1977)).

*Future Lost Earning Ability*

Kearney's family owns a group of businesses, known as the "Kearney Companies." The main company is called Kearney Construction Company, and it specializes in site development and infrastructure construction. The Kearney Companies also include other companies, including but not limited to Kearney Development Company, Florida Trucking, Florida Soil Cement, Florida Fuel Transporters, Coldwell Banke Commericial, Kearney Realty, Gulfcoast Survey Associates, and Star Property Development – all of which work in interrelated ways in property development.[5] Kearney's father, Charles Wesley Kearney, Jr. (also known as "Bing"), currently serves as the head of the Kearney Companies. Bing Kearney took over the Kearney Companies from his father, Charles Wesley Kearney, Sr., who founded Kearney Construction Company in 1956.

Kearney maintained throughout the trial that, but for the accident, he would have taken over his father's position as head of the Kearney Companies. At trial, Kearney presented a number of witnesses in support of this theory. Kearney's brother, Charles Wesley Kearney, III (also known as "Chase"), testified that before the accident Kearney enjoyed being around his father's business, was proud of being a part of the business, and had the opportunity to become a part of his father's business. Kearney's father, Bing Kearney, testified that before the accident Kearney had the desire and the ability to succeed him as the head of the Kearney Companies. Bing Kearney further testified that before the accident, he had planned on Kearney doing just that, and he had already begun to informally train Kearney on how to lead the Kearney

[5]At the time of trial, the Kearney Companies employed over 400 employees.

Companies. A long time consultant of Kearney Construction Company, Tracy Harris, testified that Kearney had been chosen by his father to become his successor and the head of the Kearney Companies. Finally, Kearney himself testified that before the accident, he had wanted to someday be in charge of the Kearney Companies, and that he was planning his future with that goal in mind.

Kearney also presented the expert testimony of Dr. Frederick A. Raffa, an economist, regarding Kearney's future earning potential. Dr. Raffa was given a hypothesis, based on the evidence presented at trial, regarding Kearney's potential future education and profession/occupation had he not been injured. More specifically, Dr. Raffa was asked to assume that Kearney would have begun working for the Kearney Companies seven years after the accident[6], starting at a salary of $120,000 per year (the same salary at which his brother started upon joining the Kearney Companies), that he would receive a 57.75% annual raise over the next ten years, thereafter making what his father currently makes (over $11,000,000 per year), and that he would continue to make approximately $11,000,000 per year until the end of his work life at age sixty-five. Dr. Raffa was then asked to calculate, based on this hypothetical, the sum of Kearney's future lost earnings. Dr. Raffa's calculations estimated that Kearney's lost future earnings would total $139,247,000.[7]

Auto-Owners presented two experts regarding Kearney's future earning potential. First, Auto-Owners proffered the testimony of Dr. Michael John Piette, an economist. Dr. Piette calculated Kearney's future lost earning ability using two different hypotheses. Under the first

---

[6]The seven years allots time for Kearney to have graduated from both high school and college (five years) and to have served in the military for two years.

[7]This total included reductions for the total amount Kearney will *actually* make during his work life, as well as income taxes.

hypothesis, Dr. Piette assumed that after high school, Kearney would have received an associate's degree. Under the second hypothesis, Dr. Piette assumed that after high school, Kearney would have received a bachelor's degree. Dr. Piette then assumed that Kearney would enter the labor market earning what the average associate/bachelor's degree holder would earn, and that Kearney's wages would continue to increase throughout his work life, until he retired at age sixty-seven. Dr. Piette then calcuated, based on these two hypotheses, the sum of Kearney's future lost earnings. Dr. Piette testified that based on his calculations, Kearney's total future lost earnings would be $938,141 with an associate's degree and $1,427,509 with a bachelor's degree.[8]

The second expert was Brenda Mulder, who is also an economist. Ms. Mulder was also given a hypothesis regarding Kearney's future education and profession, and she was asked to then form an opinion on Kearney's lost future earning ability based on that hypothesis. More specifically, Ms. Mulder was asked to assume the following: Kearney would have graduated from college as a civil engineer in 2007, he would then begin working as a civil engineer with a starting salary of $42,000 per year, and that he would continue to earn at that level until age thirty, at which time he would join his father's company at a pay rate of $120,000 per year – and that he would have continued to make approximately $120,000 per year until the end of his work life at age sixty-five. Ms. Mulder was then asked to calculate, based on this hypothetical, the sum of Kearney's future lost earnings. Ms. Mulder testified that based on her calculations, Kearney's total lost future earnings ranged from $3,804,730 to $5,234,730.[9]

---

[8]This total included a reduction for a minimum wage salary that Kearney would be able to earn during his work life.

[9]This total included a reduction for a minimum wage salary that Kearney would be able to earn during his work life.

Auto-Owners challenges the factual basis of the hypothetical upon which Dr. Raffa made his calculations[10] and also argues that the jury's award of $35,000,000 for future lost earning ability bears no reasonable relationship to the evidence presented at trial. However, any perceived deficiencies in Dr. Raffa, Dr. Piette, or Ms. Mulder's testimonies were matters for the jury to consider. It is the province of the jury to weigh the evidence, assess credibility, and consider conflicting expert testimony. See Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 35 (1944) ("The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion . . . cannot be ignored.").

The jury had before it the various experts' methodologies for calculating Kearney's future lost earnings. It is fair to say that the jury conducted its own analysis of the evidence on Kearney's future lost ability to earn, as they did not adopt any of the experts' opinions as to Kearney's future lost earning ability. However, the Court has no basis to believe that the jury did not weigh the evidence and reach its independent conclusion as to Kearney's damages based on the evidence before it. Id. While $35,000,000 is a shockingly large number and perhaps an amount greater than the Court itself would have awarded, there is no implication that the jury was influenced by prejudice or improper motive, and given the evidence the jury heard as to Kearney's earning potential, the Court concludes that the award was within the "reasonable range in which the jury could operate." Bould, 349 So. 2d at 1184-85.

Accordingly, the Court denies Auto-Owners' motion for remittitur or a new trial as to the award of damages for future lost earning ability.

---

[10]In this regard, Auto-Owners filed a pretrial motion to preclude Dr. Raffa's testimony (Doc. No. 114), which the Court orally denied during trial.

*Breadth of New Trial*

If Kearney does not agree to remit all but $2,500,000 of the jury's award for past pain and suffering, the Court must grant him a new trial. In such event, the Court must determine whether the new trial should be for both elements of damages, namely past pain and suffering and future lost earning ability, or only for past pain and suffering damages. Kearney's past pain and suffering damages constitute a discrete item of recovery, separate from the other damages awarded. The verdict form used in this case allowed the jury to separate its award of Kearney's damages for past pain and suffering from its award for future lost earning ability. (Doc. No. 262.) The Court has found that the jury's error occurred only regarding the damages awarded for past pain and suffering. Therefore, the Court finds it appropriate to "limit retrial here to the issue of [past pain and suffering damages] only." ITT Hartford Ins. Co. of the Southeast v. Owens, 816 So. 2d 572, 578 (Fla. 2002); Astigarraga v. Green, 712 So. 2d 1183, 1184 (Fla. 2d DCA 1998) ("We disagree, however, with the trial judge's conclusion that the excess verdict on one item of damages requires a new trial as to all damages.").

## III. Conclusion

Having found that a remittitur is appropriate on the jury's award for past pain and suffering, the Court conditionally denies Auto-Owners' motion for a new trial, subject to Kearney's acceptance of the remittitur. If he accepts the Court's remittitur, Kearney shall file a notice of remittitur in accordance with these terms within thirty (30) days of this order. If Kearney fails to accept the Court's remittitur within thirty (30) days, a new trial will be ordered limited to the issue of damages for past pain and suffering. Having found that a remittitur is not warranted on the jury's award for future lost ability to earn, the Court denies Auto-Owners' motion for a new trial regarding this element of damages.

**IT IS SO ORDERED** at Tampa, Florida, this 7th day of August, 2008.

Susan C. Bucklew
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record