UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLAYTON KEARNEY,

    Plaintiff,

v.                                  Case No. 8:06-cv-00595-T-24 TGW

AUTO-OWNERS INSURANCE COMPANY,

    Defendant.
_____/

## ORDER

The Court now considers Defendant's motion for summary judgment. (Doc. 472). Plaintiff Clayton Kearney opposes the motion (Doc. 488), and filed his own motion for partial summary judgment (Doc. 469), which the Court will consider in a separate order.

Since there are many unresolved issues of material fact, the Court cannot enter summary judgment on the claims in this case. Therefore, Defendant's motion for summary judgment is denied.

## BACKGROUND

On July 27, 2002, Plaintiff Clayton Kearney, the 17-year-old son of developer Charles Wesley "Bing" Kearney Jr., was severely injured in an automobile accident. At the time of the accident, Clayton Kearney had been a passenger in a car driven by an uninsured motorist.[1] Two separate insurance companies provided coverage to Clayton Kearney through policies issued to

---

[1] The driver, Jason Manning Knight, and the owner of the vehicle, Anthony David Sorrentino, did not insure the vehicle. (Doc. 2 at 3, ¶ 14.)

Clayton Kearney's father and to his father's business, Kearney Development Company, Incorporated.[2] The three insurance policies that provided uninsured motorist coverage to Clayton Kearney were:

(1) A primary policy issued by Zurich American Insurance Company, whose coverage limit became a subject of dispute;

(2) A primary policy issued by Defendant Auto-Owners Insurance Company, known as the "Recreational Vehicle Policy," which had a $30,000 coverage limit; and

(3) An umbrella policy issued by Auto-Owners, known as the "Executive Umbrella Policy," that provided excess coverage and had a $5-million coverage limit.

The primary policy issued by Zurich to Kearney Development Company, Inc. limited insurance coverage to $500,000 per incident. The policy covered 145 vehicles, and was <u>not</u> supposed to stack uninsured motorist ("UM") coverage such that a claimant could multiply the $500,000 per incident coverage limit by 145 vehicles for one incident. However, by mistake, Zurich issued the primary policy with a stacking provision.

If the stacking provision had been bona fide, it would have permitted Kearney to collect as much as $72.5 million for damages caused by the auto accident. However, in the course of this litigation, the Court ultimately determined that Zurich and Kearney Development Company, Inc. did not intend to enter into a contract with a stacking provision and that Zurich issued the policy with the stacking provision by mistake.

---

[2] Zurich American Insurance Company issued a primary policy to Kearney Development Company, Inc., which listed Clayton Kearney as a named insured. (Amended Complaint, Doc. 48, Exh. A-1 and A-2.) Defendant Auto-Owners Insurance Company also issued two policies to Plaintiff's father, Bing Kearney, that provided coverage to his son. (Policy Declarations & Executive Umbrella Policy Statement, Doc. 2, Exh. A and B.)

Whether the Zurich policy had a $500,000 or $72.5-million coverage limit, obviously affected the liability of Auto-Owners significantly. While Auto-Owners' primary policy had a $30,000 limit, Auto-Owners' Executive Umbrella policy was an excess policy that covered Clayton Kearney to the extent that his primary insurance[3] fell short of compensating him for his damages.[4] Therefore, only after Clayton Kearney exhausted his primary coverage, could he turn to the Auto-Owners umbrella policy to cover the rest of his damages up to the policy's $5-million limit.

### A. Dispute with Zurich American Insurance Company

After the automobile accident in July 2002, Kearney notified his insurance agent, Brown & Brown, of his injuries. Brown & Brown immediately notified Zurich of Kearney's insurance claim. (Fagan Dep. at 27.) However, Brown & Brown did not notify Defendant Auto-Owners of the claim at that time.[5]

When Zurich did not pay Clayton Kearney's claim, he filed suited against Zurich in state

---

[3] Clayton Kearney's primary insurance included both Auto-Owners' Recreation Vehicle Policy, with its $30,000 limit, and the Zurich primary policy.

[4] The Auto-Owners umbrella policy listed the Zurich policy as the primary policy and stated "[i]f other insurance covering a loss also covered by this policy is available to the insured, the insurance afforded by this policy shall be excess of such other insurance."

[5] Auto-Owners initially reserved the right to deny Clayton Kearney's claim because it was reported late to the company. Plaintiff points to Auto-Owners' reservation of the right to deny coverage based on late reporting as an example of its bad faith. Plaintiff argues that by reporting the auto accident to insurance agent Brown & Brown, Clayton Kearney provided notice to Auto-Owners. Plaintiff also argues that because Auto-Owners did not intend to take any action on Clayton Kearney's claim, it knew it was not prejudiced by the late reporting. (Doc. 488 at 7 ¶ 2.) Thus, Plaintiff argues that Auto-Owners reservation was "frivolous" and an example of Auto-Owners seizing on "any possible ground for refusing to honor the claim without investigation." (Doc. 488 at 13 ¶ 2.)

court in Hillsborough County.[6]  The lawsuit in circuit court, filed on April 9, 2004, alleged failure to pay insurance benefits and bad-faith in handling Clayton Kearney's claim.  (Amended Complaint, Doc. 48-3, Exh. B.)

In August 2004, two years after the auto accident and more than five months after Clayton Kearney sued Zurich, Brown & Brown notified Auto-Owners of Clayton Kearney's claim.  (Fagan fax, App. 9, Doc. 473-10.)  Auto-Owners assigned adjuster Anthony Sperandeo to the claim (Sperandeo Dep. of Jan. 22, 2009 at 44-46), and also hired attorney Michael Rywant to assist.  Id. at 73.

In September 2004, Rywant wrote to Clayton Kearney's attorney, Dale Swope, to inquire about the claim, and asked to be included "in the loop" on any mediation with Zurich.  (Rywant Letter, App. 12, Doc. 473-13.)  Rywant was informed about a mediation between Clayton Kearney and Zurich scheduled to occur in October 2004.  (Rywant Letters, App. 12-19, Docs. 473-13 to 473-20.)  Also, in October, Swope sent Rywant a copy of a settlement package that Swope had sent to Zurich.  (Rywant Dep. at 65-67.)  The package concluded a damage estimate of $10.5-million.  Plaintiff argues that it should have been clear that the $10.5-million estimate of Kearney's damages was conservative in order to get Zurich to pay at least the $500,000 limit of its policy. (Swope Letter, App. 5, Doc. 473-6.)

In November 2004, Zurich paid Clayton Kearney the $500,000 policy limit of the

---

[6] The case, Clayton Kearney v. Anthony David Sorrentino & Zurich American Insurance Company, Case No. 04-CA-003457, was filed in the Thirteenth Judicial Circuit, in and for Hillsborough County.  The case also listed Anthony David Sorrentino, the owner of the automobile in which Clayton Kearney was driving, as a defendant.  The driver of the automobile, Jason Manning Knight, was killed in the auto accident.  (Brown & Brown e-mail, Appendix 1, Doc. 473-2.)

primary policy. (Swope Letter, App. 20, Doc. 473-21.) Even though Clayton Kearney accepted the $500,000 payment, Plaintiff still maintained that Zurich's policy was stacked and that Zurich's actual policy limit was $72.5-million. However, Plaintiff would soon change his position on this issue.

On April 21, 2005, Zurich and Kearney deposed Brown & Brown insurance agent Steven Ayers. (Doc. 78.) Ayers testified that Kearney had never intended to buy a stacked insurance policy and Auto-Owners never intended to sell him a stacked policy. (Ayers Dep. of Apr. 21, 1995, Doc. 78 at 53-55.) Auto-Owners had stamped "stacked" on the policy by mistake. During the deposition, Swope said he "borderline badgered (Ayers) in my questioning to try to find any loopholes. . . . But when it was all said and done, it was confirmed to me that it was not a stacking policy. . . ." (Swope Dep. at 24.)

Plaintiff argues that Ayers' testimony should have come as no surprise to Auto-Owners. Ayers testified in a second deposition in this case[7] he had already discussed in August 2004 with an adjuster at Auto-Owners and with Chris Staffeld, a claims manager at Auto-Owners, the fact that Zurich had issued the policy to Kearney Development Company, Inc. as stacked by mistake. (Ayers Dep. of Aug. 5, 2009, Doc. 489 at 50-56, 103-05.) Ayers testified that Auto-Owners representatives were unconcerned by the stacking mistake because they felt that Auto-Owners would have no exposure based on the size of Zurich's settlement with Clayton Kearney.[8]

---

[7] Ayers' deposition of August 5, 2009 was filed under seal to protect the confidential terms of the settlement agreement between Zurich and Clayton Kearney. However, a redacted copy of the transcript was filed in the docket at No. 489.

[8] It is not clear why Auto-Owners representatives, who were not lawyers, assumed that Zurich's settlement would necessarily set-off any of Auto-Owners exposure. After holding a hearing (Doc. 301) and considering motions on the issue (Docs. 296, 299), the Court has not

<u>Id.</u>  Before Auto-Owners learned of the size of the settlement, Ayers testified that Auto-Owners said little about the claim because they were waiting for the Zurich claim to settle.  "They were just standing back and doing nothing," Ayers testified.  <u>Id.</u> at 104-105.

After the Ayers deposition, on April 28, 2005, Swope wrote Rywant to inform him Zurich maintained that Zurich's policy did not stack coverage.[9]  (Swope Letter, Doc. 196, Exh. A.)  Based on the assumption that Zurich's position was correct, Swope demanded that Auto-Owners pay Clayton Kearney the $5-million limit of the umbrella policy.  (Swope Letter, Doc. 196, Exh. A.)  Some time after the deposition, Swope also called Rywant to tell him about Ayers' deposition.  Swope told Rywant in the conversation and possibly in another conversation that he had "grilled" Ayers on the stacking issue, but that Swope would be conceding that the Zurich policy did not stack.  (Swope Dep. at 114-15.)  Given the deposition, Plaintiff argues that Auto-Owners should have investigated the stacking issue thoroughly and paid the policy limit at that time.

On July 15, 2005, Clayton Kearney and Zurich orally reached a settlement (Evans Letter, App. 24, Doc. 473-25).  As part of the settlement, both Clayton Kearney and Zurich agreed that Zurich's policy was not stacked.  Under the settlement, Zurich eventually paid Plaintiff its $500,000 policy limit and settled a bad faith claim for an additional sealed amount.

---

resolved the issue of whether Auto-Owners' liability should be reduced by Zurich's settlement. (Doc. 312.)

[9] Auto-Owners argues that Swope only informed it that Zurich had made a mistake in issuing the stacking policy.  Swope did not explain that the mistake was mutual.  The difference between a unilateral mistake and a mutual mistake can be legally significant.  A court can reform a contract because of a mutual mistake to reflect the parties' true intentions.  However, Kearney argues that Auto-Owners had a duty to inquire whether the mistake was mutual or not, and failed to follow-up with any questions.

Around the same time in July 2005 that Clayton Kearney and Zurich orally agreed to settle, Auto-Owners reiterated its position that Zurich's policy stacked coverage. On July 18, 2005, Rywant suggested to Swope that Auto-Owners might intervene in the case between Clayton Kearney and Zurich. (Rywant Letter, App. 23, Doc. 273-24.) However, Auto-Owners did not intervene in the case.[10] Of course, Auto-Owners did not know that no intervention was needed because Clayton Kearney and Zurich had already settled their dispute, at least verbally. Swope, however, did not inform Rywant of the settlment. Nor did Rywant ask Swope about any settlement.

In September 2005, Clayton Kearney and Zurich signed the settlement agreement which they had reached verbally in July. On September 26, 2005, the parties sought dismissal with prejudice of the lawsuit in state court against Zurich.

Although a check of the case's docket sheet, available online at the Hillsborough Clerk of Circuit Court's website, would have revealed the voluntary dismissal, Swope on October 10, 2005 wrote a letter to Sperandeo, Auto-Owners' adjuster, which he copied to Rywant, that informed Auto-Owners that the disagreement about whether Zurich's policy was, in fact, stacked had been resolved. (Swope Letter, Doc. 470 at 133-34, Exh. 29.) Kearney and Zurich acknowledged that Zurich had inserted the stacking provision into the contract by mistake.

---

[10] Rywant wrote to his client on July 18, 2005, that if Auto-Owners intervened in the lawsuit, Clayton Kearney might blame Auto-Owners if his lawsuit against Zurich failed. Rywant also wrote: "In my discussion with Swope, it appears that he realizes the battle with Zurich is going to be a long one. . . . I do not think he is totally comfortable with his chances of prevailing." Given this assessment, Rywant does not state whether he had considered the possibility that rather than fight the "battle," Kearney would settle—leaving Auto-Owners exposed to a claim. In fact, three days earlier, Clayton Kearney and Zurich had already reached a verbal settlement. Moreover, Rywant does not indicate whether he considered whether Auto-Owners could win the stacking claim that he suspected Swope knew was weak.

7

Brown & Brown also agreed with this position, Swope wrote. Id.

On November 1, 2005, Sperandeo also learned from Brown & Brown that Zurich and Kearney had settled their claim and also learned the sealed settlement amount. (Sperandeo Dep. of June 8, 2009 at 182-83.) After signing a confidentiality agreement, Rywant received a copy of the confidential settlement in January 2006.

### B. Dispute with Defendant Auto-Owners

In November 2005, Kearney filed a Civil Remedy Notice that gave Auto-Owners 60 days to settle Kearney's claim. Settling the claim within the 60-day cure period would eliminate a bad-faith insurance claim. Fla. Stat. § 624.155(1)(d). See also Talat Enter., Inc. v. Aetna Cas. & Sur. Co., 952 F. Supp. 773, 778 (M.D. Fla. 1996). Auto-Owners responded to the Civil Remedy Notice on January 9, 2006, by offering several reasons why Auto-Owners would not pay Kearney's claim.[11] (Doc. 470, Exh. 14.) Among the reasons for denying the claim, Auto-Owners said Clayton Kearney had already been fully compensated for his damages. Id.

On February 24, 2006, Clayton Kearney filed suit in state court in Hillsborough County against Auto-Owners for failure to pay under the primary and executive umbrella policies, and for bad-faith handling of Plaintiff's claims under both policies.[12] Defendant removed the case to

---

[11] However, after Clayton Kearney filed the Civil Remedy Notice, Auto-Owners on December 6, 2005, paid the Plaintiff $30,000 from Kearney's primary policy, known as the "Recreational Vehicle Policy." (Rywant Letter, Doc. 470-2, Exh. 14.) Auto-Owners originally asserted that this primary policy would not be paid until Plaintiff exhausted the Zurich policy. However, Auto-Owners reconsidered its position. Id.

[12] Prior to the lawsuit, Auto-Owners had paid Plaintiff $30,000 under the primary policy. (Complaint, Doc. 2 at 3, ¶ 15.)

federal court on April 7, 2006.[13]

In the litigation that followed, Auto-Owners moved for summary judgment[14] (Doc. 81), arguing in part that it had no duty to pay Clayton Kearney because he had settled with Zurich for less than the total stacked amount of $72.5 million.[15] Auto-Owners argued that Zurich had issued Kearney Development Company, Inc. a stacked policy, which raised Zurich's liability for Clayton Kearney's damages to $72.5-million. The Court referred the motions to the Magistrate Judge, who found that the Zurich policy mistakenly contained a stacking provision and that Auto-Owners' umbrella policy took effect when Plaintiff's damages reached $530,000. (Doc. 118.)

On August 7, 2007, the Court adopted the Magistrate's Judge Report and Recommendation. (Doc. 143.) About a month later on September 5, 2007, Auto-Owners unconditionally paid Clayton Kearney the $5-million limit on the umbrella policy.[16] (Rywant Letter & Email, Doc. 196, Exh. C-D.)

The case proceeded to trial on the issue of liability and damages in November 2007. At

---

[13] Because Defendant was not served with the state court complaint until March 10, 2006, removal was timely. 28 U.S.C. § 1446.

[14] Auto-Owners moved for summary judgment on March 19, 2007, approximately a year after being served with Plaintiff's complaint. (Doc. 81.)

[15] Auto-Owners also argued that its umbrella policy should not be triggered unless Clayton Kearney's damages exceeded the $500,000 limit of the Zurich policy, plus the sealed settlement amount that Clayton Kearney and Zurich reached to settle the state court insurance and bad faith claims. (Doc. 81.)

[16] Auto-Owners mailed the $5-million check to Clayton Kearney's attorney on August 24, 2007, but Plaintiff did not accept the check until September 5, 2007, when Auto-Owners dropped its demand that its payment was conditioned on a waiver of rights and a right of reimbursement. (Rywant Letters and E-mails, Doc. 196, Exhs. B-D.)

9

trial, the jury found the uninsured motorist to be 80 percent at fault for Kearney's injuries, and Kearney—who had not been wearing a seatbelt at the time of the accident—to be 20 percent at fault. (Doc. 262 at 1.) The jury found that Plaintiff had sustained $35-million in future damages for lost earning ability and $25-million in damages for past pain and suffering. (Doc. 262 at 2.)

The Court later reduced Plaintiff's past pain and suffering award from $25 million to $2.5 million. (Doc. 311.) The adjusted sum of Plaintiff's damages, therefore, was $37.5 million. Subtracting 20 percent, to account for Plaintiff's fault, Kearney's total damages equaled $30 million.

After the jury determined liability and damages,[17] the parties proceeded to litigate whether Auto-Owners acted in bad faith in refusing to pay Clayton Kearney's claim earlier. This case is set for trial in November 2009.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Id. When

---

[17] Before trial, Clayton Kearney and Auto-Owners agreed to dismiss with prejudice counts one and three of the Complaint. (Docs. 138, 139.) On the first day of trial, the Court dismissed count two of the Complaint. (Doc. 243.) That left only count four, the bad faith claim related to Auto-Owners' umbrella policy.

a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue of material fact for trial. Id. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50.

## ANALYSIS

Florida law authorizes an insured party to sue its insurer for "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(b)(1).

"An insurer . . . has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Boston Old Colony Ins. Co., 386 So. 2d 783, 785 (Fla. 1980). "The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." Id.

Normally, a bad faith claim is premature until liability and damages have been

determined. Blanchard v. State Farm Mut. Auto. Ins. Co., 575 So. 2d 1289, 1291 (Fla. 1991). However, the law does not require every insurer to wait for a court to fix liability and damages. "When liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." Powell, 584 So. 2d at 14.

Because of the nature of the claim, the jury may consider the insurance company's negligence, if any, in determining whether or not the insurer acted in bad faith. Id. However, negligence alone does not amount to bad faith. Travelers Indem. Co. of Ill. v. Royal Oak Enter. Inc., 429 F. Supp. 2d 1265, 1271 n.21 (M.D. Fla. 2004). In addition, "[b]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause." Powell v. Prudential Prop. & Cas. Ins. Co., 584 So. 2d 12, 14 (Fla. 3d DCA 1991).

In determining whether an insurance company acted in bad faith, courts apply a "totality-of-the-circumstances" standard. State Farm Mut. Auto Ins. Co. v. LaForet, 658 So. 2d 55, 62-63 (Fla. 1995). A court considers the following factors in weighing the totality of the circumstances in a bad faith claim based on an insurer's denial to a coverage dispute: (1) whether the insurer was able to obtain a reservation of the right to deny coverage if a defense was provided; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute. Id.

In weighing the "totality-of-the-circumstances," including the substance of the legal dispute and weight of legal authority underlying the insurance company's position, a jury

necessarily must evaluate whether an insurer acted in good faith by insisting on legal arguments that a court later rejected. However, the jury does not decide the merits of the legal issues that the insurer raised. Instead, the jury decides whether the insurer acted in good faith by pursing a legal argument, rather than settling, when "it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(b)(1).

The Florida Supreme Court has held repeatedly that "bad faith is ordinarily a question for the jury." Berges v. Infinity Ins. Co., 896 So. 2d 665, 681 (Fla. 2004). Although on occasion the facts of a case allow a court to rule on a bad faith claim as a matter of law at summary judgment,[18] this is not one of those rare cases.

**A. Auto-Owners' Legal Arguments Do Not Resolve the Claim As A Matter of Law**

Numerous genuine issues of material fact remain in this case. While Auto-Owners offers several significant reasons to explain its five-year delay in paying Clayton Kearney's claim, Auto-Owners' explanations do not prove its good faith as a matter of law, particularly when the Court must view the evidence in the light most favorable to Plaintiff on this summary judgment motion. A jury could choose to find Auto-Owners' reasons prudent and reasonable, or a jury could choose to believe that Auto-Owners deliberately dragged out litigation to avoid paying Clayton Kearney's claim.

Auto-Owners first asks the Court to find as a matter of law that it acted in good faith by conducting a diligent investigation into Clayton Kearney's claim because it hired an attorney to investigate Clayton Kearney's claim. While retaining an attorney and relying on the attorney's advice may be evidence of good faith, it does not prove good faith as a matter of law, especially

---

[18] See Shin Crest PTE, Ltd. v. AIU Ins. Co., 605 F. Supp. 2d 1234 (M.D. Fla. 2009).

13

where, as here, a genuine issue of material fact exists as to whether the insurer's representatives failed to communicate with each other and follow-up on evidence that the Zurich policy did not stack coverage, as Plaintiff asserts.

Auto-Owners also asks this Court to find as a matter of law that it acted in good faith because it submitted the Zurich policy to this Court and asked this Court to decide the extent of Zurich's coverage. The law neither required Auto-Owners to take this matter to court nor prohibited it from doing so, so long as Auto-Owners acted in good faith at all times.[19] Thus, Auto-Owners' decision to litigate the extent of Zurich's coverage may be evidence of its good faith, but its decision under the facts of this case does not resolve the question of good faith as a matter of law.

On one hand, Auto-Owners argues that a prudent business executive would not rush to pay the limits of a $5-million policy before determining whether it owed anything on the policy at all. As the umbrella insurance carrier, Auto-Owners only had to pay the excess liability beyond what Zurich was required to pay. Thus, the extent of Zurich's liability determined how much, if anything, Auto-Owners would have to pay Kearney. The amount of Zurich's liability

---

[19] Auto-Owners cites only one Florida Supreme Court case to support the proposition that it had a right and a duty not to pay Clayton Kearney's claim until it determined the claim to be legitimate. Time Ins. Co., Inc. v. Burger, 712 So.2d 389, 393 (Fla. 1998). However, Time Insurance Co. Inc. dealt with a different question than the one before this Court. Time Insurance Co. Inc. addressed whether a bad-faith plaintiff can seek damages for emotional distress where the insurer's bad-faith denial of coverage caused plaintiff to lose needed health care treatment. In the case, the insurer stopped paying plaintiff's medical bills because the insurer's special investigation unit had launched an investigation into whether plaintiff had defrauded the company. Id. at 390. In dicta, the Court remarked, "Insurers have a right and a duty to other policyholders to contest illegitimate claims." Id. at 393. This is an unremarkable proposition—but one totally inapposite to the facts in this case, which involves no claim of fraud.

14

largely turned on whether or not its policy stacked coverage.[20] If the coverage was stacked, Zurich's liability would be as much as $72.5-million, and Auto-Owners' liability under the umbrella policy would probably be zero. However, if the coverage was not stacked, Zurich's liability would be only $500,000, and Auto-Owners' liability would likely be the $5-million limit of the policy. Certainly, Auto-Owners had some basis for its belief that Zurich's policy was stacked. On its face, Zurich's policy contained an express stacking provision.

On the other hand, Kearney offered evidence, creating a genuine issue of material fact for a jury to decide, that Auto-Owners knew, or should have known, by April 2005, if not earlier, that Kearney Development Company, Inc. had not purchased a stacking policy with Zurich. Steven Ayers, the Brown & Brown insurance agent, testified at his deposition in April 2005 that Zurich did not sell companies with 145 vehicles stacked insurance policies. Ayers testified that he had "never really seen a large fleet policy issued with stacked limits." (Ayers Dep. at 7, 9.) The cost would have been prohibitive. (Ayers Dep. at 10.)

Moreover, if Auto-Owners believed that Zurich's policy was stacked to provide as much as $72.5-million in coverage for a single incident, then presumably, Auto-Owners' premiums would have reflected this fact. Presumably, the cost of an excess umbrella policy would have been significantly lower if Auto-Owners' liability only kicked in after $72.5-million in damages.

In addition, Ayers testified that Brown & Brown had discovered the mistake and asked Zurich in writing to correct mistake. (Ayers Dep. at 53-54.) For whatever reason, Zurich never

---

[20] Auto-Owners also argues that its liability depended on the amount of Kearney's damages, his liability for failing to wear a seat belt, and any set-off that it was entitled to receive. This is true. However, the stacking issue dwarfed those issues in importance. Because of the severe nature of Kearney's injuries and his potential economic losses as the successor to a highly-profitable development company, Auto-Owners should have reasonably anticipated that Kearney's damages would easily exceed $500,000.

followed-up and corrected the error.  Id.

The fact that this Court ultimately determined that Zurich's policy was not stacked—limiting Zurich's liability to $500,000—does not, in itself, prove that Auto-Owners acted in bad faith, however.  Vest v. Travelers Ins. Co., 753 So. 2d 1270, 1275 (Fla. 2000).  "The insurer has a right to deny claims that it *in good faith* believes are not owed on a policy.  Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith."  Id. (emphasis added).

While the law does not penalize an insurer for raising a legal issue unsuccessfully, Vest v. Travelers Ins. Co., 753 So. 2d 1270, 1275 (Fla. 2000), it does not automatically credit an insurance company with acting in good faith because it raised a non-frivolous legal issue.  The framework of Florida's bad-faith statutes clearly creates an economic incentive for insurers to settle claims in good faith.  If an insurance company acts in bad faith by dragging out disputes and forcing a lawsuit simply to delay paying the insured, the insurer can face potentially large bad-faith damages.

Auto-Owners also argues that it had no duty to pay Kearney until Kearney established that he had exhausted his primary insurance coverage with Zurich.  Indeed, Auto-Owners argues that it not only lacked a duty to pay Kearney, but had an affirmative duty to its others customers to avoid paying Kearney prematurely.  In raising this issue, Auto-Owners in essence asks us to revisit the similar, if not identical, issues it raised before the Magistrate Judge.  The Court declines to review anew at summary judgment the legal issues already decided by the Court.

Suffice it to say: Auto-Owners bases this argument on the contract language in its policy, which provides that its coverage shall be in "excess" of the Zurich primary coverage.  The contract language, however, does not provide Auto-Owners a defense to bad faith as a matter of

16

law. The contract itself contains no provision that required Auto-Owners to wait to pay until the primary insurance policy had paid Kearney and all legal disputes had been adjudicated by a court. Auto-Owners' policy only provides that the amount of its coverage shall be in "excess" of primary insurance.

Moreover, even if the contract required Auto-Owners to wait until Zurich paid Kearney under its primary policy, Auto-Owners still did not pay Kearney immediately after learning that Zurich had settled and paid its $500,000 policy limit. Thus, the contract language, even if interpreted as Auto-Owners wishes, does not resolve Kearney's bad-faith claim as a matter of law under the facts of this case.

Next, Auto-Owners argues that it acted in good-faith as a matter of law by paying the $5-million limit of its coverage after this Court's ruling in August 2007, which found that the Zurich policy did not provide stacked coverage. Auto-Owners argues that it could have waited longer to pay—for instance, it could have waited until the conclusion of the jury trial on liability and damages in November 2007, or it could have waited for the Court to decide if Zurich's payment should be set-off, which is a matter that still has not been resolved. (Doc. 312.) While the jury can consider Auto-Owners' decision to pay its $5-million policy limit after the Court's ruling on the stacking issue as evidence of its good faith, it does not establish good faith as a matter of law under the facts of this case.

Auto-Owners also argues that it cannot be liable for bad faith as a matter of law because it "pursued a resolution" of legal issues in this litigation. This argument puzzles the Court since Auto-Owners did not so much seek a judicial resolution of the dispute, as much as it defended itself from a lawsuit. Auto-Owners could have sought to intervene on the stacking issue in the lawsuit between Zurich and Clayton Kearney. But it did not intervene. Auto-Owners also could

17

have sought declaratory relief asking a court to determine its rights and duties under its umbrella policy. But it did not seek declaratory relief. Instead, Auto-Owners waited until Clayton Kearney filed a Civil Remedy Notice and then filed a lawsuit—actions which Clayton Kearney argues he was forced to do by Auto-Owners' bad-faith unwillingness to settle. Then, nearly a year later, Auto-Owners filed a motion for summary judgment raising the legal issues in dispute.

Auto-Owners argues that it waited to raise the legal issues in defense because it anticipated Clayton Kearney's lawsuit. Even if that is the case, the Court finds it hard to see how Auto-Owners' defensive posture, which arguably contributed to a three-year delay in paying the umbrella policy's $5-million limit, establishes good faith as a matter of law under the facts of this case.

Auto-Owners cites Pozzi Window Co. v. Auto-Owners Insurance Inc., 446 F.3d 1178 (11th Cir. 2006), for the proposition that an insurer cannot commit bad faith as a matter of law when a question of law arises about coverage. But Pozzi does not stand for such a broad proposition. In Pozzi, unlike in this case, Auto-Owners filed for declaratory relief to determine its duties and rights. Moreover, the coverage dispute in Pozzi involved an unsettled question of Florida law that split Florida's district courts of appeal. Id. at 1186-88. The Eleventh Circuit upheld the court's decision to rule for Auto-Owners on the bad-faith claim as a matter of law after a jury verdict because (1) the coverage issue was "subject to serious debate;" (2) Auto-Owners' denial of coverage was "well-reasoned;" (3) there was no evidence that Auto-Owners misrepresented its policy terms; (4) Auto-Owners did not subject the insured to additional damage beyond denying coverage; and (5) the evidence did not support the jury's bad-faith verdict. Id. at 1189.

Unlike the court in Pozzi, which ruled after a jury verdict, this Court at summary

judgment must draw every reasonable inference in favor of the non-moving party, Clayton Kearney. Thus, the Court cannot find, drawing every reasonable inference in Clayton Kearney's favor, that Auto-Owners' claim that the Zurich policy was stacked was "subject to serious debate" until the moment the Court ruled on it in August 2007.

## **CONCLUSION**

Accordingly, the motion for summary judgment filed by Defendant Auto-Owners Insurance Company (Doc. 472) is **DENIED**.

**ORDERED AND ADJUDGED** at Tampa, Florida this 19th day of October, 2009.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge


Copies to:
Counsel of Record